UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Eric Hu; NY Drilling, Inc.; and 888 Consulting Corp.,<br><br>        Plaintiffs,<br><br>— against —<br><br>The City of New York; Rick D. Chandler; Dennis Burkart; Jose L. Espaillat; Muhammad Imran; Michael Camera; Rafael Collis; Salvator Concialdi; Salvatore Concialdi; Robert Turner; Cesar Romero; D. Eric Hoyt; and John and Jane Does nos. 1-10,<br><br>        Defendants. | **17-cv-2348 (ARR) (LB)**<br><br>**Opinion & Order**<br><br>**Not for electronic or print publication** |
| Henry Hang Hsin; Cheng Wei-Hsin; 43 162 St. Management, Inc.; 162 Management LLC; Laludia Management Inc.; Macrusa Management Inc.; E & V Control Management Inc.; and Consulting Management Inc.,<br><br>        Plaintiffs,<br><br>— against —<br><br>The City of New York; Rick D. Chandler; Peter Sun; Dennis Burkart; Norman Ho; D. Eric Hoyt; and John and Jane Does nos. 1-10,<br><br>        Defendants. | **17-cv-3795 (ARR) (LB)**<br><br>**Opinion & Order**<br><br>**Not for electronic or print publication** |

ROSS, United States District Judge:

The plaintiffs in the related actions of *Hu* and *Hsin* are Asian-American construction workers, contractors, property developers, and real estate companies. They allege that various officials working for the New York City Department of Buildings ("DOB"), led by Assistant Chief Inspector Dennis Burkart, have engaged in a "campaign of harassment," targeting their work sites

by issuing unwarranted violations and stop-work orders ("SWOs"). This harassment, they claim, is motivated by both Burkart's racial animus and his personal hostility toward Eric Hu. The plaintiffs raise equal protection and due process claims, statutory claims under 42 U.S.C. § 1981, *Monell* claims against the City of New York ("City"), and state-law taxpayer action claims.

Defendants have moved to dismiss both complaints under Federal Rule of Civil Procedure 12(b)(6), for substantially identical reasons. Because the two complaints—and the two motions—deal with an overlapping set of parties and events, involve the same attorneys, and rest on essentially the same legal grounds, I will deal with both motions in a single opinion.

For the following reasons, the defendants' motions to dismiss are granted in their entirety.

## BACKGROUND[1]

### A. The parties

The plaintiffs in *Hu* are Eric Hu, a Taiwanese-American excavator; 888 Consulting Corporation, a company he formed in 2015; and NY Drilling, Inc., a contracting company that used to employ Hu and now contracts with 888 Consulting Corporation. First Am. Compl. ¶¶ 20–22, 47–48 ("*Hu* Compl."), Case No. 17-cv-2348, ECF No. 33.[2] The plaintiffs in *Hsin* are Henry Hang Hsin and Cheng Wei-Hsin, both Taiwanese-American property developers, as well as real estate companies of which they are owners or fiduciaries. First Am. Compl. ¶¶ 46–48 ("*Hsin*

---

[1] The defendants attach the records of administrative proceedings as exhibits to their motions to dismiss, largely upholding the various notices of violation and SWOs discussed below. When ruling on a motion to dismiss, a district court may consider "matters of which judicial notice may be taken." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)). And among the matters of which judicial notice may be taken are the records of administrative proceedings. *Joglo Realties, Inc. v. Seggos*, 229 F. Supp. 3d 146, 149 n.3 (E.D.N.Y. 2017). Nonetheless, I will not discuss or rely upon these exhibits because it is not necessary to consider any materials outside of the four corners of the complaint in order to resolve this motion.

[2] Since I cite to the electronic dockets of both *Hu* and *Hsin*, I indicate the case number before giving the docket number when citing to documents posted on ECF.

Compl."), Case No. 17-cv-3795, ECF No. 27. The *Hsin* plaintiffs own 45-37 162nd Street in Flushing, Queens, *id.* ¶ 49, where the *Hu* plaintiffs were contractors, *Hu* Compl. ¶ 98.

There is a long history of enmity between Burkart and Hu, dating back to at least 2011. *See Hu* Compl. ¶ 50. That year, Hu complained to the DOB about Burkart's racially discriminatory enforcement of the building code. *Id.* ¶¶ 80, 82. This resulted in a meeting between Hu; Burkart; an aide to a New York City councilman; and Inspector Kaleid, the then-head of DOB's Concrete Enforcement Unit ("CEU"), where Burkart works. *Id.* ¶ 81. At this meeting, Kaleid stated that "Burkart inspects properties outside of his region on his own time, but he is good for the City because he generates a lot of revenues through his issuance of notices of violation." *Id.* ¶ 83.

Several subsequent events further soured relations between Burkart and Hu. Later in 2011, Hu sued another DOB inspector, George Garris, after he was hit by a car driven by Garris. *Id.* ¶¶ 84–85. Burkart was a passenger in this car. *Id.* ¶ 84. Although Burkart was not named as a defendant in this lawsuit, *see id.* ¶ 85, Burkart and Garris may have been disciplined by the DOB as a result of hitting a pedestrian with a DOB car while they were performing inspections outside of their assigned route, *id.* ¶ 90. Then Hu reported another DOB inspector, Massimo Dabusco, to the FBI for attempting to extort him by "promising preferential treatment from the DOB if certain vendors were used." *Id.* ¶¶ 92–94. As a result, Dabusco left the DOB in 2015 and was indicted in 2016. *Id.* ¶¶ 94–95. Dabusco pleaded guilty in front of Judge Irizarry of this Court and was sentenced to eighteen months of imprisonment. Case No. 16-cr-559, ECF Nos. 22-23, 47.

Burkart has been heard calling Hu "a rat" because of his reporting of Dabusco. *Hu* Compl. ¶ 96. Burkart has also "been overheard bragging about going to shut down every one of Hu's jobsites around the city and giving an SWO at every one of them." *Id.* ¶ 75. One of Burkart's subordinates, Inspector Jose L. Espaillat, has said that Burkart has a picture of Hu on his wall. *Id.*

¶ 78. Burkart and the members of his team search DOB databases to see if Hu has filed for permits or is involved in jobs, and make site visits "to the vast majority of Hu's jobs." *Id.* ¶¶ 73–74.

In addition to his "personal vendetta against Hu," *id.* ¶ 72, Burkart is biased against Asians because he believes "that they drove him out of business." *Id.* ¶ 52; *Hsin* Compl. ¶ 58. Before he worked for the DOB, Burkart owned a general contracting company. *Hu* Compl. ¶ 53; *Hsin* Compl. ¶ 59. He has been "overheard blaming Asians for. . . undercut[ting] his rates to a point where he could not compete." *Hu* Compl. ¶ 54; *accord Hsin* Compl. ¶ 60. He has also made unspecified comments "displaying his [anti-Asian] bias at jobsites, while on DOB business, wearing official DOB clothing, and bearing his DOB badge." *Hu* Compl. ¶ 55; *Hsin* Compl. ¶ 61.

Burkart's targeting of Asians for enforcement actions is not limited to Hu. Although he has a predetermined route and region, he detours from this route on a regular basis to inspect properties in Flushing, Queens, where there is a higher concentration of Asian construction workers and companies. *Hu* Compl. ¶¶ 57–58; *Hsin* Compl. ¶¶ 63–64. He does so even on his own time, while off-duty. *Hu* Compl. ¶ 58; *Hsin* Compl. ¶ 64. He also sends other DOB inspectors outside of their assigned routes to issue violations to Asian developers and contractors. *Hu* Compl. ¶ 163. When Burkart visits construction sites, he will sometimes go to locations, take photographs, and leave without taking any enforcement action; shortly thereafter, another DOB inspector will return and issue violations for the conditions observed by Burkart. *Id.* ¶¶ 164–65.

Although DOB's "enforcement activities are primarily undertaken as a result of complaints received from the general public," *Hu* Compl. ¶ 62; *Hsin* Compl. ¶ 68, Burkart often inspects work sites without receiving a complaint from the general public, *Hu* Compl. ¶ 60; *Hsin* Compl. ¶ 66. He also issues violations and SWOs for "aspects of construction not typically policed by CEU" and not within his area of expertise. *Hu* Compl. ¶ 61; *Hsin* Compl. ¶ 67.

While there are various other DOB officials named as individual defendants in the *Hu* and *Hsin* complaints, Burkart is the prime mover in both complaints. No other DOB official is alleged to harbor anti-Asian bias, and the other defendants' roles are limited to carrying out his orders, acting on his referrals, or failing to take action to rein in his discriminatory enforcement.

## B. Specific instances of discriminatory enforcement

The complaint in *Hu* describes the actions of the defendants as a "campaign of harassment," and states that the plaintiffs "have experienced a level of discrimination, harassment and intimidation and damage to their businesses . . . , such that their businesses have been extraordinarily impacted." *Hu* Compl. ¶¶ 7, 13. The amended complaint, however, describes only four specific instances of discriminatory enforcement, although it refers to these instances as mere "examples" of a pattern of "systemic harassment." *See id.* ¶¶ 169, 178, 190, 197, 199.

The complaint in *Hsin*, similarly, describes Burkart and the DOB as engaging in a "campaign of harassment" and states that, by turning a blind eye to this activity, the City is allowing the DOB "to run itself like a street gang." *Hsin* Compl. ¶¶ 1, 8. But the complaint details only two specific incidents in this campaign, the first of which is also contained in the *Hu* complaint.

### 1. The 45-37 162nd Street incident

The first instance of harassment occurred on March 23, 2017, at 45-37 162nd Street in Flushing, Queens. On that day, Burkart first came to the job site alone, claiming that he had heard a complaint regarding a truck blocking traffic while he was at another job site. *Hu* Compl. ¶¶ 99–100; *see also Hsin* Compl. ¶ 95. Although Burkart is a supervisor in a DOB unit dealing with concrete testing, *Hu* Compl. ¶ 51; *Hsin* Compl. ¶ 57, there was no concrete work being performed at 45-37 162nd Street on this day, and the job site was outside of his assigned route. *Hu* Compl. ¶¶ 102–104; *see also Hsin* Compl. ¶ 94. A truck was lawfully parked in front of the job site, removing

materials from the work site, pursuant to a Department of Transportation (DOT) permit. *Hu* Compl. ¶¶ 105–09; *see also Hsin* Compl. ¶¶ 96–97. Nonetheless, Burkart told the truck driver that he would not be allowed to load his truck, and that he would not be allowed back into the job site, incorrectly asserting that the truck was blocking traffic and not allowed to be where it was. *Hu* Compl. ¶¶ 109–111. Burkart then called one of his subordinates, Inspector Muhammad Imran, to the job site. *Id.* ¶¶ 112–13; *see also Hsin* Compl. ¶ 95. Imran left his regularly scheduled route to come to 45-37 162nd Street and order the truck to drive away without a load. *Hu* Compl. ¶¶ 114–15; *see also Hsin* Compl. ¶¶ 95–96. Imran then refused to identify himself to Hu upon request, in violation of the New York City Administrative Code. *Hu* Compl. ¶¶ 121–22; *see also Hsin* Compl. ¶ 102.

Before leaving 45-37 162nd Street, Burkart directed Imran to issue a SWO. *Hu* Compl. ¶ 123. Imran did not do so that day but the next day, March 24, the DOB served the job site with a SWO dated March 23, for failure to have copies of job plans onsite. *Id.* ¶¶ 124–25; *Hsin* Compl. ¶ 105. This SWO was issued by the Building Enforcement Safety Team, or "BEST Squad," instead of the CEU. *Hu* Compl. ¶ 124; *Hsin* Compl. ¶ 107. Despite this SWO, complete job plans were onsite; in fact, Burkart viewed all of these plans and Imran admitted to viewing some of them. *Hu* Compl. ¶¶ 126–28; *see also Hsin* Compl. ¶ 106. This SWO meant that all work at 45-37 162nd Street had to stop until the SWO was rescinded. *See Hu* Compl. ¶¶ 129–33; *Hsin* Compl. ¶ 108–12.

The violation for failure to have copies of the job plan onsite was dismissed in July 2017, but a partial stop-work order is still in place because DOB Assistant Chief Engineer Eric Hoyt has ordered an audit of the job plans based on Burkart's referral. *Hu* Compl. ¶¶ 139–41, 143; *Hsin* Compl. ¶¶ 116, 118–23. Hoyt demanded that the plaintiffs provide him with plans for the backfilling of the excavation in order for him to partially lift the SWO; although the plaintiffs

complied with this demand, it is not standard industry practice and cost them $20,000. *Hu* Compl. ¶¶ 150–52; *Hsin* Compl. ¶¶ 129–31. Hoyt has further demanded that the plaintiffs provide technical reports from an architect or engineer verifying the stability of existing structures in order for him to fully lift the SWO. *Hu* Compl. ¶¶ 146–47; *Hsin* Compl. ¶¶ 125–26. But the plaintiffs cannot comply with this demand because no foundation has been poured and thus there are no existing structures. *Hu* Compl. ¶¶ 148–49; *Hsin* Compl. ¶¶ 127–28. Hoyt has made various other demands for plans that are in excess of standard industry practice, refusing to fully lift the SWO until the corrections he has demanded to the plans are made. *Hu* Compl. ¶¶ 156–57; *Hsin* Compl. ¶¶ 135–36. In violation of standard industry practice, Hoyt has also stopped construction work from proceeding at three adjacent construction sites on 162nd Street—45-35 162nd Street, 45-39 162nd Street, and 45-41 162nd Street—based on their proximity and design similarity to 45-37 162nd Street. *Hu* Compl. ¶¶ 154–55; *Hsin* Compl. ¶¶ 133–34. All four of these 162nd Street properties are owned by the *Hsin* plaintiffs. *Hsin* Compl. ¶ 49.

### 2. The 35-20 146th Street incident

The second instance of harassment referenced in the *Hu* complaint occurred on May 23, 2016, at 35-20 146th Street in Flushing, Queens. *Hu* Compl. ¶ 178. Burkart issued a Class I safety violation for a truck that was blocking the sidewalk without a DOT permit, although it was only temporarily loading material. *Id.* ¶¶ 178–79. He then issued a SWO based on this violation, serving it the next day. *Id.* ¶ 178. This violation was ultimately dismissed on July 22, 2016. *Id.* ¶ 180.

Burkart also called in the BEST Squad to impose a SWO at this location on May 24, 2016; the BEST Squad imposed a SWO based on a purported defect in the fencing, although they had previously approved a fence plan. *Id.* ¶¶ 182–83. The "146th Street Jobsite consisted of several contiguous lots, and Burkart demanded that a construction fence be built around the perimeter of

each individual lot, rather than around the entirety of the parcel." *Id.* ¶ 184. This was contrary to standard industry practice, since it would inhibit movement on the job site. *Id.* ¶ 185. After the BEST squad lifted its SWO on June 22, 2016, Burkart refused to re-inspect the property so that his SWO could be lifted until the plaintiffs built a fence around each lot, although his SWO was for blocking the sidewalk. *Id.* ¶ 186. He did not lift the SWO until October 2016. *Id.* ¶¶ 186, 189.

### 3. The 139-20 34th Avenue incidents

The third instance of harassment referenced in the *Hu* complaint occurred at 139-20 34th Avenue Street in Flushing, Queens. *Id.* ¶ 190. First, on July 11, 2016, Burkart issued a violation to the *Hu* plaintiffs for having a pool of standing water on their construction site. *Id.* This pool of water "was being used to flush a drilling hole, which is standard practice when drilling." *Id.* (The complaint also states that the pool of standing water was a result of "heavy rains." *See id.* ¶ 191.)

A month later, on August 15, 2016, Burkart required the *Hu* plaintiffs to install plywood fencing to protect the walls of neighboring properties. *Id.* ¶ 193–94. He required them to do so despite this being contrary to standard industry practice, and the original plans having already been approved. *Id.* ¶ 194. The BEST Squad later inspected the property and determined that no violation was warranted for the failure to install protection on neighbors' walls. *Id.* ¶ 195.

As a result of these enforcement actions, the *Hu* plaintiffs were fired from this job site, suffering an "enormous monetary loss." *Id.* ¶ 196.

### 4. The 42-47 157th Street incident

The fourth instance of harassment referenced in the *Hu* complaint occurred at 42-47 157th Street in Flushing, Queens, where the *Hu* plaintiffs were working. *Id.* ¶ 197. An unspecified DOB inspector issued this project a SWO on October 18, 2016, for a series of trumped-up violations: (a) failing to post fence design plans, despite the fact that this is not required for two-family houses;

(b) failing to build fencing around a hole that was not deep enough that building code required a fence; and (c) for cracks in the sidewalk that "were objectively not trip hazards." *Id.* Despite "the lack of legal basis" for this SWO, *id.* ¶ 198, it was not lifted "for two months." *Id.* ¶ 197.

### 5. The snow violations

Finally, the second incident of harassment referenced in the *Hsin* complaint occurred at three properties owned by the *Hsin* plaintiffs in Flushing, Queens. *Hsin* Compl. ¶ 143. On January 9, 2017, Burkart issued violations to 43-05 162nd Street, 45-37 162nd Street, and 45-39 162nd Street for failing to keep the sidewalk free from ice and snow even though the job sites were closed that days. *Id.* ¶¶ 142–44. Although the violations all stated that they were served on January 14, 2017, the plaintiffs were never served with these violations. *Id.* ¶¶ 151–52. As a result, the plaintiffs defaulted on all three violations, incurring fines of $8,000 per violation. *Id.* ¶ 152.

### C. Procedural history

After the defendants filed letters requesting a pre-motion conference to discuss their anticipated motions to dismiss, I held a consolidated pre-motion conference in *Hu* and *Hsin.* At this conference, I discussed what I saw as the pleading defects in the original complaints, which were substantially similar to the defects I discuss below. *See* Tr. of Civil Cause for Telephonic Conference at 3–20, 17-cv-2348, ECF no. 43-8 ("Pre-Motion Conf. Tr."). I granted the plaintiffs leave to amend their complaints prior to the defendants filing any motions to dismiss, and plaintiffs' counsel agreed that the amended complaints would be his "last and best complaint[s]." *Id.* at 3. The plaintiffs subsequently filed amended complaints in both *Hu* and *Hsin*; most notably, they added a discussion of purported "comparators" to both complaints. *See Hu* Compl. ¶¶ 200–45; *Hsin* Compl. ¶¶ 165–215. The present motions to dismiss followed.

**DISCUSSION**

In deciding a motion to dismiss under Rule 12(b)(6), this Court must "accept[] all factual allegations in the complaint as true" and "draw[] all reasonable inferences in the plaintiff's favor." *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013) (quoting *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)). Nonetheless, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Only "a plausible claim for relief survives a motion to dismiss." *LaFaro v. N.Y. Cardiothoracic Grp.*, 570 F.3d 471, 476 (2d Cir. 2009). Further, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (quoting *Twombly*, 550 U.S. at 555).

## I. The plaintiffs' equal protection and § 1981 claims fail because they have not provided sufficiently similar comparators.

The crux of the plaintiffs' complaints is that Burkart and his colleagues discriminatorily enforced building codes based on racial bias against Asians and personal animus toward Hu. The first three claims in *Hu* and the first two claims in *Hsin* allege this conduct deprived the plaintiffs of their constitutional right to equal protection as well as their statutory right to make and enforce contracts without racial discrimination, thus giving them a cause of action under 42 U.S.C. § 1981, 42 U.S.C. § 1983, and the Fourteenth Amendment. *See Hu* Compl. ¶¶ 259–324; *Hsin* Compl. ¶¶ 224–67. While § 1983 allows individuals to sue for deprivations of constitutional rights carried out under color of state law, § 1981 provides that all persons "shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981.

The parties agree that the plaintiffs are bringing these claims under selective enforcement and "class-of-one" theories. *See* Defs.' Mem. of Law in Supp. of Mot. to Dismiss 11–13 ("*Hu*

Defs.' Mem. of Law"), Case No. 17-cv-2348, ECF No. 44; Defs.' Mem. of Law in Supp. of Mot.

to Dismiss 11–12 ("*Hsin* Defs.' Mem. of Law"), Case No. 17-cv-3795, ECF No. 39; Mem. of Law

in Opp. to Defs.' Mot. to Dismiss 29–38, Case No. 17-cv-2348, ECF No. 45 ("*Hu* Pls.' Mem. of

Law"); Mem. of Law in Opp. to Defs.' Mot. to Dismiss 32–38, Case No. 17-cv-3795, ECF No.

41 ("*Hsin* Pls.' Mem. of Law"). To allege an equal protection or § 1981 claim on either a selective

enforcement or a class-of-one theory, the plaintiffs must show the existence of sufficiently

similarly situated individuals of a different group who were not subject to such enforcement

action. *See Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 2000); *Joglo Realties, Inc. v. Seggos*, 229

F. Supp. 3d 146, 152–53 (E.D.N.Y. 2017). In other words, they must show comparators. The

plaintiffs contend that they have done so, *Hu* Pls.' Mem. of Law 29–38; *Hsin* Pls.' Mem. of Law

32–38; the defendants argue that they have not, *Hu* Defs.' Mem. of Law 11–17; *Hsin* Defs.' Mem.

of Law 11–15. As I explain below, I agree with the defendants.

### A.  Legal standard

To state a class-of-one claim, "a plaintiff must establish that (i) no rational person could

regard the circumstances of the plaintiff to differ from those of a comparator to a degree that

would justify the differential treatment on the basis of a legitimate government policy; and (ii) the

similarity in circumstances and difference in treatment are sufficient to exclude the possibility that

the defendants acted on the basis of a mistake." *Ruston v. Town Bd. for Skaneateles,* 610 F.3d 55, 60

(2d Cir. 2010) (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006)). This requires

the plaintiffs to "show an extremely high degree of similarity between themselves" and their

comparators. *Id.* at 59 (quoting *Clubside, Inc.*, 468 F.3d at 159).

To state a selective enforcement claim, plaintiffs must plead facts that allow the court to

reasonably infer that (1) "compared with others similarly situated, [they were] selectively treated;

and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *LeClair v. Saunders*, 627 F.2d 606, 609–10 (2d Cir. 1980). "'[T]he precise standard for determining whether comparators are similarly situated' for purposes of a selective enforcement claim is an unsettled question in this circuit." *Joglo Realties, Inc.*, 229 F. Supp. at 153 (alteration in original) (quoting *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 693 (S.D.N.Y. 2011)).

As I have previously explained, while "[s]ome district courts have held that the standard in selective enforcement cases is the same as that in 'class of one' cases," I will "appl[y] a slightly more lenient standard, asking whether plaintiffs are similarly situated to comparators 'in all material respects.'" *Id.* (quoting *Mosdos Chofetz Chaim, Inc.*, 815 F. Supp. 2d at 696). "To satisfy this standard, 'plaintiffs must identify comparators whom a prudent person would think were roughly equivalent, but plaintiffs need not show an exact correlation between themselves and the comparators.'" *Id.* (quoting *Mosdos Chofetz Chaim, Inc.*, 815 F. Supp. 2d at 696). Thus, for a selective enforcement claim, "[t]he test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. . . . Exact correlation is neither likely nor necessary, but the cases must be fair congeners. . . . [A]pples should be compared to apples." *Id.* (alterations in original) (quoting *T.S. Haulers, Inc. v. Town of Riverhead*, 190 F. Supp. 2d 455, 463 (E.D.N.Y. 2002)).

While more lenient than the standard for class-of-one cases, this is still a stringent standard. Plaintiffs are required to show similarly situated comparators in selective enforcement cases because "government officials retain wide discretion about enforcement decisions." *Id.* at 155 (quoting *Schubert v. City of Rye*, 775 F. Supp. 2d 689, 707 (S.D.N.Y. 2011)); *see also Pyke v. Cuomo*,

258 F.3d 107, 109 (2d Cir. 2001) ("[C]ourts grant special deference to the executive branch in the performance of the 'core' executive function of deciding whether to prosecute."). This is because "an agency decision not to enforce often involves a complicated balancing of a number of factors," including "whether a violation has occurred, [and] whether agency resources are best spent on this violation or another." *Joglo Realties, Inc.*, 229 F. Supp. 3d at 155 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)). Due to resource constraints, "[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing.'" *Id.* (alteration in original) (quoting *Heckler*, 470 U.S. at 831).

The same pleading standards apply to the plaintiffs' claims that they were deprived of their right under § 1981 to make and enforce contracts on the same terms as white citizens as apply to their claim under § 1983 that they were deprived of their constitutional right to equal protection of the laws. *Brown*, 221 F.3d at 339. "Section 1981, like the Equal Protection Clause, only prohibits intentional racial discrimination." *Id.* (citing *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391 (1982)). Therefore, "to plead a § 1981 claim alleging selective enforcement, plaintiff[s] must allege instances in which 'similarly situated' non-minorities were treated differently." *Id.* (citing *Albert v. Carovano*, 851 F.2d 561, 573 (2d Cir. 1989)).

### B. Comparators

The plaintiffs provide three purported comparators in both the *Hu* and *Hsin* complaints.

The first comparator relates to the 139-20 34th Avenue job site, where Burkart issued a violation to the *Hu* plaintiffs for having a pool of standing water on the construction site. *Hu* Compl. ¶ 190. At an unspecified later date, "Burkart returned to the 34th Avenue Jobsite when similarly situated Caucasian workers were working on the pool—which still had water in it—and did not interrupt their work, nor did he serve a notice of violation." *Id.* ¶ 201. The plaintiffs do

not specify, however, how these workers were similarly situated to the *Hu* plaintiffs, other than that they were working at the same job site and also had a pool of standing water.

The second comparator relates to a job site owned by one of the *Hsin* plaintiffs, located at 43-05 162nd Street. *Id.* ¶ 210. Until 2015, a company named Vera Construction, owned by Luis Vera, "was doing the foundation work" at this location. *Id.* ¶¶ 211–12. (The plaintiffs allege that Vera Construction is "similarly situated" to NY Drilling and that Mr. Vera is "similarly situated" to Hu and 888 Consulting Corp. without giving any facts to support these assertions. *See id.* ¶¶ 213–14.) The Asian owner of the job site "was acting as the general contractor of the project." *Id.* ¶ 215. Burkart did not issue Vera Construction any violations while it was working at this location, but told Mr. Vera that he would shut the site down when Vera stopped working there. *Id.* ¶¶ 216, 218. "Upon information and belief, the reason for this representation was that . . . the 43-05 Jobsite was going to be self-general contracted by the Asian owner." *Id.* ¶ 217. Once Vera finished its work, "Burkart stopped the job from at least August to October 2015." *Id.* ¶ 219.

Finally, the *Hu* complaint details some issues with a building shifting during work at a job site in Manhattan overseen by general contractor Westerman Construction Company, Inc., "a company which is not owned and/or operated by Asians." *Id.* ¶ 222. The complaint alleges that "[b]ased upon the work that it does, and the role that it was performing at the West 22nd Jobsite, Westerman is similarly situated to NY Drilling and its agents are similarly situated to Hu and 888." *Id.* ¶ 223. But the plaintiffs do not specify how Westerman or its agents are similarly situated to any of the *Hu* plaintiffs. Despite the building shifting, the DOB inspecting the job site numerous times due to 311 complaints, and a false stability report being filed, no one from the DOB issued Westerman any violations until cracks appeared in an adjoining building. *See id.* ¶¶ 224–42. On the other hand, at a construction site operated by Asian construction professionals who are not

plaintiffs in either the *Hu* or *Hsin* actions, the DOB immediately issued notices of violation and a stop-work order when "similar movement and cracking occurred." *Id.* ¶¶ 243–44.

The *Hsin* complaint describes the same three comparators, but does not detail how they are similarly situated to the *Hsin* plaintiffs. Instead, the *Hsin* complaint also alleges that these comparators were similarly situated to the *Hu* plaintiffs or to Asian construction professionals who are not a party to either action. *See Hsin* Compl. ¶¶ 173–213.

Both the *Hu* and *Hsin* complaints also rely on statistics about the issuance of violations to allege a pattern of disparate treatment. Based on a FOIL request, the plaintiffs state that sixty-three percent of the violations personally written by Burkart were issued "to Asian developers, contactors and others in the construction industry." *Hu* Compl. ¶ 204; *Hsin* Compl. ¶ 168. In contrast, between eight and fourteen percent of violations issued by the inspector defendants[3] were issued to Asian workers (with the exception of Inspector Jose Espaillat, who issued twenty-eight percent of his violations to Asian workers). *Hu* Compl. ¶ 203; *Hsin* Compl. ¶ 167. The plaintiffs do not, however, provide the information necessary to understand these statistics. For example, they do not describe how they determined whether a violation was issued to an Asian person, what the sample size was, the percentage of Asian developers and contractors in the industry, or the percentage of Asian developers and contractors on Burkart's normal route.

### C. Analysis

Even accepting all the factual allegations of the complaint as true and drawing all inferences in the plaintiffs' favor, the *Hu* and *Hsin* plaintiffs have failed to plausibly allege that they "are

---

[3] The inspector defendants are Espaillat, Muhammad Imran, Michael Camera, Rafael Collis, Salvatore Concialdi, Robert Turner, Cesar Romero, and John and Jane Does Nos. 1-10. *Hu* Compl. ¶ 4.

similarly situated to [the] comparators 'in all material respects.'" *Joglo Realties, Inc.*, 229 F. Supp. 3d at 153 (quoting *Mosdos Chofetz Chaim, Inc.*, 815 F. Supp. 2d at 696)).

The complaints state that the first two proffered comparators are "similarly situated" to the *Hu* and *Hsin* plaintiffs. *See Hsin* Compl. ¶¶ 176–77, 188, 194–95; *Hu* Compl. ¶¶ 201, 213–14, 223. But this is "a legal conclusion couched as a factual allegation," which I need not accept as true. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

The most probative factual allegation provided to support these assertions is that Burkart issued a violation to the *Hu* plaintiffs for having a pool of standing water at 139-20 34th Avenue but did not issue white workers a violation for having a pool of standing water at the same location. *Hu* Compl. ¶ 190, 201; *Hsin* Compl. ¶ 184–89. While this is suggestive, it is not sufficient to show that any of the plaintiffs were similarly situated to these white workers in *all* material respects. The plaintiffs did not allege anything else that made these workers similarly situated, such as how deep the standing water was, how long it had been sitting at the site, or whether there were other violations at the job site. "[A]llegations that the comparators violated the same rules and regulations . . . are insufficient to show that plaintiffs and the comparators are similarly situated in all material respects. Plaintiffs were also required to plead facts allowing the court to infer that the *manner* and *extent* of the violations is similar." *Joglo Realties, Inc.*, 229 F. Supp. 3d at 156.

Even more glaringly, the plaintiffs did not plead any factual allegations to support their assertions that Vera Construction is "similarly situated" to NY Drilling and that Mr. Vera is "similarly situated" to Hu and 888 Consulting Corp. *See Hu* Compl. ¶¶ 210–20; Hsin Compl. ¶¶ 174–83. That Burkart only shut down work at 43-05 162nd Street after Vera stopped working there does not show that the plaintiffs were similarly situated to Vera. Indeed, the plaintiffs do not even provide the reason Burkart gave for issuing a SWO at this site, or whether these same

conditions were present when Vera was the general contractor.

The third comparator proffered by the plaintiffs does not help them satisfy the requirement to show comparators either. Westerman is described as being treated more leniently than unnamed similarly situated Asian construction professionals who are not a party to either action. *See Hsin* Compl. ¶¶ 212–13; *Hu* Compl. ¶¶ 243–44. But the relevant questions for a selective enforcement claim are whether the *plaintiffs* were treated differently than others who were similarly situated in all material respects and whether "such selective treatment was based on impermissible considerations such as race . . . or malicious or bad faith intent to injure a person." *LeClair*, 627 F.2d at 609–10. That the defendants generally "treated non-Asian practitioners in the construction industry differently than Asian construction practitioners," *Hu* Compl. ¶ 209; *Hsin* Compl. ¶ 173, may help the plaintiffs meet the second prong of the *LeClair* test, but it does not help them meet the requirement for a selective enforcement claim of providing similarly situated comparators.

Nor do the statistics provided by the plaintiffs support a plausible claim of selective enforcement. While "statistics alone may be sufficient to warrant a plausible inference of discriminatory intent" at the motion to dismiss stage, they "must not only be statistically significant in the mathematical sense, but they must also be of a level that makes other plausible non-discriminatory explanations very unlikely." *Burgis v. N.Y.C. Dep't of Sanitation*, 798 F.3d 63, 69 (2d Cir. 2015); *see also Brown v. City of New York*, Case No. 16-cv-1106, 2017 WL 1102677, at *4–5 (E.D.N.Y. Mar. 23, 2017). Without further context, I cannot determine whether these statistics are meaningful indicia of discrimination. *See Burgis*, 798 F.3d at 70 (holding that raw numbers showing racial disparities, without some context, cannot support an inference of discriminatory intent). For example, plaintiffs do not specify whether these statistics refer to all of the violations issued by various DOB inspectors or just some of the violations, or which year(s) these statistics

cover. *See Hu* Compl. ¶¶ 203–04; *Hsin* Compl. ¶¶ 167–68. They also do not specify how they determined whether a violation was issued to an Asian person, the percentage of Asian developers and contractors in the industry, or the percentage of Asian developers and contractors on Burkart's normal route. *See id.*

Even if the statistics proffered by the plaintiffs were "of a level that makes other plausible non-discriminatory explanations very unlikely," this would still not establish that the plaintiffs were treated differently than similarly situated non-Asian individuals. Statistics alone cannot show whether those who are treated differently are similarly situated in all material respects. And such a showing of similarly situated comparators is the *sine non qua* of a selective enforcement claim.

Since the plaintiffs have failed to allege sufficiently similarly situated comparators for their selective enforcement claim to survive a motion to dismiss, their class-of-one claim also fails. After all, class-of-one claims require plaintiffs to show an even higher degree of similarity to comparators than selective enforcement claims. *See Joglo Realties, Inc.*, 229 F. Supp. 3d at 153.

Although "leave to amend a complaint should be 'freely given when justice so requires,'" it is nonetheless "well established that leave to amend a complaint need not be granted when amendment would be futile." *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003) (quoting Fed. R. Civ. P. 15(a)). Here, I conclude that granting plaintiffs leave to amend their complaint again would be futile because I have already discussed the issue of comparators with the plaintiffs, who then filed what they agreed were their last and best complaints. *See* Pre-Motion Conf. Tr. at 3–9. I therefore dismiss the first three claims in *Hu* and the first two claims in *Hsin* with prejudice.

**II. The plaintiffs' due process claims fail because they have not been deprived of their ability to engage in an occupation or suffered systematic harassment.**

The plaintiffs' due process claim—the fourth claim in *Hu* and the third claim in *Hsin*—also fails for substantially the reasons put forth by the defendants. Specifically, the plaintiffs have failed to provide factual allegations that support a plausible claim that they have been deprived of a liberty or property interest. *See Hu* Defs.' Mem. of Law. 17–20; *Hsin* Defs.' Mem. of Law 15–18.

To assert a due process claim a plaintiff must first allege "the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972) (procedural due process); *see also Clubside, Inc.*, 468 F.3d at 152 (substantive due process). The plaintiffs argue that they have done so in two ways. First, they state that they have alleged an infringement on their property and liberty rights to "make and enforce contracts." *Hu* Pls.' Mem. of Law 39; *Hsin* Pls.' Mem. of Law 39. Second, they claim that they have "sufficiently plead[ed] infringement of their liberty interests in the form of 'the freedom to engage in any of the common occupations of life.'" *Hu* Pls.' Mem. of Law 41 (quoting *Cityspec, Inc. v. Smith*, 617 F. Supp. 2d 161, 169 (E.D.N.Y. 2009)); *Hsin* Pls.' Mem. of Law 40 (same).

Plaintiffs' first asserted property or liberty interest appears to simply be a restatement of their § 1981 claim, which they also describe as a due process claim. *See Hu* Pls.' Mem. of Law 38–40; *Hsin* Pls.' Mem. of Law 38-40. To the extent that it is not simply rehashing the § 1981 claim, this interest is coextensive or interchangeable with their second stated interest. Plaintiffs allege that their right "to make and enforce contracts has been infringed in manners including, without limitation, preventing future ventures; impacting relationships due to known bias; and breaches of contracts due to delays." *Hsin* Pls.' Mem. of Law 39 (citing *Hsin* Compl. ¶¶ 141–52, 216–21, 253–65); *see also Hu* Pls.' Mem. of Law 40 ("Plaintiff[']s right to make and enforce contracts has been infringed in manners including, without limitation, effectively being blackballed and

terminated from existing assignments due to DOB bias."). This is tantamount to the purported

deprivation of "the freedom to engage in any of the common occupations of life." *Hu* Pls.' Mem.

of Law 41 (quoting *Cityspec, Inc.*, 617 F. Supp. 2d at 169); *Hsin* Pls.' Mem. of Law 40 (same).

As for the second asserted interest, plaintiffs can show a deprivation of a liberty "interest

in pursuing a chosen occupation" sufficient to state a due process claim by showing that the

challenged actions "effectively prohibit[ed them] from engaging in a profession, or pursuing *any*

job in a given field." *Cityspec, Inc.*, 617 F. Supp. 2d at 169 (emphasis added). But "[i]t stretches the

concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in

one job but remains as free as before to seek another.'" *Roth*, 408 U.S. at 575; *see also Cityspec, Inc.*,

617 F. Supp. 2d at 169 ("This right is not [so] broad as to protect the right to a particular job.").

Alternatively, plaintiffs can make out a due process claim without meeting this requirement

by showing "'a true pattern of harassment by government officials,' where that harassment is

'systematic and intentional.'" *Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 718–19 (S.D.N.Y.

2012) (quoting *Chalfy v. Turoff*, 804 F.2d 20, 22–23 (2d Cir. 1986) (per curiam)). Cases in which

such claims have been upheld, however, typically involve defendants either "act[ing] illegally" or

"us[ing] their legal authority for a purpose other than that for which it is intended" in order to try

to "driv[e] plaintiffs out of business." *Contractors Against Unfair Taxation Instituted on New Yorkers

(C.A.U.T.I.O.N.) v. City of New York*, No. 93 Civ. 4718, 1994 WL 455553, at *3 (S.D.N.Y. Aug. 19,

1994) (collecting cases). This "kind of systematic and intentional harassment" occurs where, for

example, "teams of inspectors issued 344 unwarranted building code violations." *Chalfy*, 804 F.2d

at 23 (citing *Espanola Way Corp v. Myerson*, 690 F.2d 827, 828 (11th Cir. 1982)).

Even drawing all inferences in the plaintiffs' favor, the factual allegations of plaintiffs'

complaints do not support a plausible claim that the defendants' actions have (a) entirely precluded

the plaintiffs from continuing in their chosen profession, or (b) that these actions constitute the kind of systematic and intentional harassment discussed by *Chalfy, C.A.U.T.I.O.N.*, and *Bertuglia*.

As for the first theory, although Hu alleges that he was fired from a job at 35-20 146th Street due to one of the challenged enforcement actions, *Hu* Compl. ¶ 196, losing a single job is not enough to deprive him of his right to pursue his chosen occupation. *Cityspec, Inc.*, 617 F. Supp. 2d at 169. Nor is it enough to allege that the plaintiffs have been "deprived of [their] rights to take advantage of future employment and/or business opportunities, which has been and will result in severe economic harm, which to date has already been significant." *Hsin* Compl. ¶ 286; *accord Hu* Compl. ¶ 340. The defendants' enforcement actions have undoubtedly caused economic harm to the plaintiffs—the *Hu* plaintiffs lost a job and the *Hsin* plaintiffs had to pay fines—but there is no allegation that it prohibited them from engaging in their chosen occupation—*i.e.*, that it caused them to lose out on *all* jobs or go out of business. And this is what is required to show a deprivation of a liberty interest. *See Cityspec, Inc.*, 617 F. Supp. 2d at 169; *see also Roth*, 408 U.S. at 575.

As for the plaintiffs' second theory, although the plaintiffs refer to a "campaign of harassment," *Hu* Compl. ¶ 7; *Hsin* Compl ¶ 8, asserting this does not make it so. The five enforcement actions they challenge here simply do not amount to "systematic and intentional harassment." While they refer to these five incidents as "examples" of a larger pattern of harassment, *see, e.g., Hu Compl.* ¶ 199, they do not provide additional factual allegations that show that Burkart and other DOB inspectors have led a "campaign of harassment," *Hu* Compl. ¶ 7; *Hsin* Compl. ¶ 8. Even crediting plaintiffs' assertions that Burkart and other inspectors took some additional unspecified enforcement actions, absent factual allegations as to the number and nature of such actions, this does not raise a plausible claim of systematic harassment.

Certainly, drawing all inferences in the plaintiffs' favor, the complaint supports a plausible

claim that Burkart is targeting Hu. The factual allegations of the complaint include: (a) that Burkart and the members of his team search DOB databases to see if Hu has filed for permits or is involved in jobs, and make site visits "to the vast majority of Hu's jobs"; (b) that Burkart has "been overheard bragging about going to shut down every one of Hu's jobsites around the city and giving an SWO at every one of them"; and (c) that one of Burkart's subordinates stated that Burkart has a picture of Hu on his wall. *Hu* Compl. ¶ 73–75, 78. But this still does not make out a plausible claim that the defendants have either engaged in the kind of illegal or widespread activity necessary to make out a claim of systematic and intentional harassment.

This is not a case, like *Bertuglia*, where the defendant allegedly "personally lied to prosecutors in an intentional effort to initiate a baseless criminal case against the plaintiffs," and then visited the plaintiff's clients "to spread information about the allegedly baseless criminal charges . . . , in order (successfully) to drive [plaintiff] out of business." 839 F. Supp. 2d at 719. Nor, contrary to defendants' assertion, were the actions alleged in *Espanola Way Corp.* "substantially similar to the deprivations [alleged] here." *Hu* Defs.' Mem. of Law 43 n.13; *Hsin* Defs.' Mem. of Law 42 n.17. While *Espanola Way Corp.* also involved purportedly unwarranted violations issued by building inspectors, that case involved pervasive harassment originating at the top: the Miami Beach Commissioners put together a task force "to conduct frequent inspections of designated hotels and to write numerous and burdensome violations . . . until they were driven out of business." 690 F.2d at 828. As a result, the plaintiff was cited for *344* building code violations, "as well as numerous fire violations." *Id.* Here, by contrast, the plaintiffs complain of a sum total of five enforcement actions. This is simply not sufficient to show a systematic campaign of harassment. *See Chalfy*, 804 F.2d at 23; *C.A.U.T.I.O.N.*, 1994 WL 455553 at *3 (citing cases where the defendants engaged in an extensive pattern of prosecution of adult bookstores in

an admitted attempt to drive them out of business, or issued numerous parking violations and criminal summonses to a van operator in an apparent effort to drive him out of business).

Plaintiffs argue that it is "premature" to require allegations of "specific jobs fired or specific jobs lost" at the pleading stage. *Hu* Pls.' Mem. of Law 40; *Hsin* Pls.' Mem. of Law 40. But *Twombly* and *Iqbal* require that the factual allegations of the complaint support a plausible claim to relief. Plaintiffs quote *Twombly* for the proposition that "the purpose of the pleading is to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Hu* Pls.' Mem. of Law 40 (quoting *Twombly*, 550 U.S. at 555 (alteration in original)); *Hsin* Pls.' Mem. of Law 40 (same). But in the very next breath, *Twombly* goes on to state that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (internal citations omitted). A complaint does not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557). It is not enough to simply assert that "these defendants engaged in a pattern of harassment by government officials which was intentional and systemic," that "this pattern of harassment by government was designed to destroy Plaintiffs' businesses," and that "these named defendants violated Plaintiff's liberty interests to engage in any of the common occupations of life, which include pursuit of future employment opportunities and . . . the right to practice their chosen profession." *Hu* Compl. ¶¶ 332–34; *see also Hsin* Compl. ¶¶ 275–77.

Because the factual allegations of the *Hu* and *Hsin* complaints do not raise a plausible claim to relief on the plaintiffs' due process claims, and I believe that granting the plaintiffs further leave to amend the complaint would be futile, I dismiss these claims with prejudice.

### III. The plaintiffs' *Monell* claims fail because there is no underlying constitutional violation, they have not adequately alleged a municipal policy, custom, or practice, and they have not pointed to any training deficiency.

As an initial matter, plaintiffs' *Monell* claims—the fifth claim in *Hu* and the fourth claim in *Hsin*—fail because, for the reasons discussed above, they have not alleged a plausible claim that a city employee violated their constitutional rights. Without an underlying deprivation of constitutional rights, there can be no municipal liability. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Curley v. Village of Suffern*, 268 F.3d 65, 70–71 (2d Cir. 2001).

Plaintiffs' *Monell* claims also fail to state a plausible claim to relief for a second, independent reason: "[T]o survive a motion to dismiss, Plaintiff cannot merely allege the existence of a municipal policy or custom, but 'must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists.'" *Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 535 (S.D.N.Y. 2012) (quoting *Santos v. City of New York*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012)). Here, the plaintiffs failed to provide the requisite factual allegations to support such an inference. *See* Hu Compl. ¶¶ 345–62; *Hsin* Compl. ¶¶ 291–313. Instead they have provided the kind of "vague, conclusory assertions" of the existence of a municipal policy or custom that do not support a plausible claim for relief. *Triano*, 895 F. Supp. 2d at 535–36; *see also Iqbal*, 556 U.S. at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" (quoting *Twombly*, 550 U.S. at 556)).

Unlike with standard tort claims, "a city cannot be held responsible [under § 1983] on a theory of *respondeat superior*" because "constitutional torts committed by city employees without official sanction or authority do not typically implicate the municipality in the deprivation of constitutional rights." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004). Nonetheless, even if "a city's official policy is constitutional[,] . . . the city may be held liable for

its employees' unconstitutional acts" if the de facto custom or practice is unconstitutional or "the city is aware that its policy may be unconstitutionally applied by inadequately trained employees but . . . consciously chooses not to train them." *Id.* at 125–26. As well, "a city employee's single tortious decision or course of action" can support "municipal liability where it is taken by, or is attributable to, one of the city's authorized policymakers. Thus, even a single action by a decisionmaker who 'possesses final authority to establish municipal policy with respect to the action ordered' is sufficient to implicate the municipality in the constitutional deprivation." *Id.* at 126 (citation omitted). Further, in cases where a policymaker delegated her authority to lower-ranking officials, the "plaintiffs may establish that the city is liable . . . by proving that 'the authorized policymakers approve[d] a subordinate's decision and the basis for it.'" *Id.* (second alteration in original) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). In sum, "when a subordinate municipal official is alleged to have committed the constitutional violation, municipal liability turns on the plaintiffs' ability to attribute the subordinates' conduct to the actions or omissions of higher ranking officials with policymaking authority." *Id.*

Cases involving municipal liability for failures to act are particularly difficult to prove. "A municipality may be liable for the failure to supervise or discipline its employees 'only where the need to act is so obvious, and the inadequacy of the current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need.'" *Triano*, 895 F. Supp. 2d at 538 (citing *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007)). And deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997)). Thus, to allege a *Monell* claim on a theory of failure to train or failure to supervise, the plaintiffs are required

to provide factual allegations in their complaints that support a plausible claim that "a policymaking official exhibit[ed] deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice.'" *Amnesty Am.*, 361 F.3d at 126 *(*quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)); *see also id.* at 127–30.[4]

Here, the factual allegations of the complaint do not support a plausible claim that the actions of Burkart and other DOB employees are attributable to the City or a municipal policymaker. There is no allegation that there is an official DOB policy to discriminate against either Hu or Asians. There is also no allegation that "a policymaker ordered or ratified the subordinates' actions," *id.* at 126 (citing *Weber v. Dell*, 804 F.2d 796, 803 (2d Cir. 1986). Indeed, although DOB Commissioner Chandler is named as a defendant in both suits, there is no allegation that he authorized or even knew of any of the challenged enforcement actions.

Finally, there are no factual allegations that would support an inference that a "policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Id.* (citing *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870–71 (2d Cir. 1992)). The plaintiffs allege that Hu complained of Burkart's racially discriminatory enforcement of the building code as early as 2011, but the head of the CEU, not DOB Commissioner Chandler, attended a meeting to discuss this conduct. *See Hu* Compl. ¶¶ 80–83. In fact, although this grievance was directed "to the Commissioner of Builders at the time," *id.* ¶ 80, there is nothing in the complaint that indicates that it was ever brought to the personal attention

---

[4] While there is language in *Amnesty America* "that suggests that conclusory allegations about a municipality's failure to train its employees may be sufficient" to survive a motion to dismiss, that case was decided prior to *Iqbal* and *Twombly*. *Simms v. City of New York*, Case No. 10-CV-3420, 2011 WL 4543051, at *2 n.3 (E.D.N.Y. Sept. 28, 2011). "Since those decisions, courts in this district have generally required that plaintiffs provide more than a simple recitation of their theory of liability, even if that theory is based on a failure to train." *Id.* (collecting cases).

of the Commissioner rather than one of his subordinates. And there are no factual allegations that would support an inference that the head of the CEU is a "decisionmaker [like Chandler] who 'possesses final authority to establish municipal policy with respect to the action ordered.'" *Amnesty Am.*, 361 F.3d at 126. Further, although the complaints refer to the "deliberate indifference" of both the City and Commissioner Chandler, *Hu* Compl. ¶¶ 348, 360; *Hsin* Compl. ¶¶ 296, 311, there are no factual allegations that plausibly support an inference that the "need to act [was] so obvious, and the inadequacy of the current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need.'" *Triano*, 895 F. Supp. 2d at 538. A single complaint made by a single aggrieved individual was not enough to put Commissioner Chandler on notice of a pattern or practice of constitutional violation such that his subsequent inaction constitutes deliberate indifference.

The plaintiffs' reliance on *Reynolds v. Guliani*—a case where the Second Circuit held that the plaintiffs failed to establish a *Monell* claim—is misplaced. *See Hu* Pls.' Mem. of Law 45; *Hsin* Pls.' Mem. of Law 44–45. It is true that *Reynolds* stated that "*Monell*'s policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." 506 F.3d at 192. But the *Reynolds* court went on to state that "[s]uch a pattern, if sufficiently persistent or widespread as to acquire the force of law, may constitute a policy or custom within the meaning of *Monell*." *Id.* The five incidents of purportedly discriminatory enforcement alleged by the *Hu* and *Hsin* complaints do not amount to a "pattern of misconduct" that is "sufficiently or widespread as to acquire the force of law."

In sum, instead of factual allegations, the plaintiffs offer the kind of "'naked assertion[s]' devoid of 'further factual enhancement'" that do not suffice to state a plausible claim to relief.

*Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557). Even if the plaintiffs had plausibly alleged an underlying constitutional violation, they failed to plead factual allegations that plausibly support a claim of an unconstitutional policy or that the allegedly unconstitutional actions of DOB inspectors can be attributed to the "actions or omissions of higher ranking officials with policymaking authority." *Amnesty Am.*, 361 F.3d at 126. I therefore dismiss plaintiffs' claims of municipal liability with prejudice. *See Ellis*, 336 F.3d at 127.

### IV. This Court will decline to exercise supplemental jurisdiction over the plaintiffs' state-law claim.

Finally, I will dismiss without prejudice the plaintiffs' state-law claims alleging the misuse of taxpayer funds under New York State General Municipal Law § 51. (This is the sixth claim in *Hu* and the fifth claim in *Hsin. See Hu* Compl. ¶¶ 368–81; *Hsin* Compl. ¶¶ 319–22.)

A district court "may decline to exercise supplemental jurisdiction over" a state-law claim if, as I have done here, it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). When evaluating whether to exercise supplemental jurisdiction in this situation, district courts should balance "values of judicial economy, convenience, fairness, and comity—the '*Cohill* factors.'" *Klein & Co. Futures, Inc. v. Bd. of Trade*, 464 F.3d 255, 262 (2d Cir. 2006) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). The Supreme Court has made clear, however, that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Cohill*, 484 U.S. at 350 n.7.

This is such a case. As I have dismissed plaintiffs' federal constitutional claims prior to any discovery being taken, none of the *Cohill* factors support the exercise of supplemental jurisdiction. Moreover, the plaintiffs specifically asked this Court to dismiss their taxpayer actions claims without prejudice in the event that this Court dismissed all of their federal claims, so that these

claims may be re-filed in state court along with other state-law claims. *See Hu* Pls.' Mem. of Law 49; *Hsin* Pls.' Mem. of Law 49. Therefore, I decline to exercise supplemental jurisdiction over plaintiff's pendent state-law claims, and dismiss these claims without prejudice.

## CONCLUSION

For the foregoing reasons, defendants' motions to dismiss are granted in their entirety.[5] The plaintiffs' equal protection, § 1981, due process, and *Monell* claims are dismissed with prejudice. The plaintiffs' state-law claims are dismissed without prejudice to re-filing in state court. The Clerk of Court is directed to enter judgment in favor of defendants and terminate both cases.

_____/s/_____
Allyne R. Ross
United States District Judge

Dated:        March 9, 2018
              Brooklyn, New York

---

[5] I do not discuss the defendants' arguments that some (but not all) of the plaintiffs in both actions lack standing, *see Hu* Defs. Mem. of Law 10–11; *Hsin* Defs. Mem. of Law 10–11, or that the claims against some or all of the individual defendants should be dismissed, *see Hu* Defs. Mem. of Law. 25–28; *Hsin* Defs. Mem. of Law 24–27, because it is not necessary to do so to resolve these motions to dismiss. For the same reason, I also do not address the defendants' argument in the alternative that Article 78 proceedings provide sufficient process such that the plaintiffs cannot state a viable due process claim. *See Hu* Defs. Mem. of Law. 20–22; *Hsin* Defs. Mem. of Law 18–20.